**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

NICOLE P.,[1]                          )
                                       )
    *Plaintiff*,                    )
                                       )
       v.                      )          Civil No. 3:23-cv-307-SLS
                                       )
MARTIN O'MALLEY,                       )
Commissioner of the                    )
Social Security Administration,[2]     )
                                       )
    *Defendant*.                    )
_____)

## MEMORANDUM OPINION

In this action, Plaintiff Nicole P. seeks review of the Commissioner of the Social Security Administration's ("SSA") decision to deny her Title XVI application for Supplemental Security Income ("SSI"). This matter comes before the Court on cross-motions for summary judgment, which have been fully briefed, making this matter ripe for review. (ECF Nos. 11, 12, 13.) The Court exercises jurisdiction with the consent of the parties pursuant to 28 U.S.C. § 636(c)(1) (ECF Nos. 3, 15, 16) and pursuant to 42 U.S.C. § 405(g).

Plaintiff asks the Court to reverse the Commissioner's decision and remand with instructions to award disability benefits. (ECF No. 12, Plaintiff's Memorandum Supporting Her Motion for Summary Judgment ("Pl's Mem.") at 19.) As the basis for such relief, Plaintiff

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that federal courts refer to claimants by their first names and last initials in social security cases.

[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, he has been substituted for Acting Commissioner Kilolo Kijakazi as Defendant in this action. No further action need be taken. 42 U.S.C. § 405(g).

challenges the residual functional capacity ("RFC") finding, contending that the Administrative Law Judge ("ALJ") erred by rejecting: (1) Plaintiff's hearing testimony and medical evidence regarding her migraines, intellectual disability, and mental health conditions; and (2) the medical opinions of Umar Alam, M.D. ("Dr. Alam"), Jamina Liverman, N.P. ("NP Liverman"), Germaine Kelley-Pope, P.N.P. ("NP Kelley-Pope"), and Debbie Mehl, LCSW ("LCSW Mehl"). (Pl.'s Mem. at 2, 13-19). In response, the Commissioner argues that substantial evidence supports the ALJ's RFC finding, including her consideration of the medical opinions, and thus, the decision should be affirmed. (ECF No. 13, Defendant's Motion for Summary Judgment and Brief in Support Thereof ("Def's Mem.") at 17-28.)

For the reasons set forth below, this Court finds that the ALJ properly considered Plaintiff's subjective complaints, the medical evidence, and other record evidence and that substantial evidence supports the ALJ's RFC determination regarding Plaintiff's concentration, pace, and persistence, as well as her absenteeism, ability to stay on task, and her ability to interact with others. In addition, the ALJ's analysis of the medical opinions of Dr. Alam, NP Liverman, NP Kelley-Pope, and LCSW Mehl comport with applicable law and find substantial support in the evidence. Therefore, the Court will DENY Plaintiff's Motion for Summary Judgment (ECF No. 11), GRANT the Commissioner's Motion for Summary Judgment (ECF No. 13), and AFFIRM the final decision of the Commissioner.

## I.     PROCEDURAL HISTORY

Plaintiff filed a Title II application for disability insurance benefits and a Title XVI application for SSI on March 30, 2020, alleging disability beginning on March 30, 2012.

(Administrative Record ("R.") at 16, 134, 136, 246.)[3]   In her applications, Plaintiff alleged that she suffered from attention deficit hyperactivity disorder ("ADHD"), depression, bipolar disorder, intellectual disability, and migraines.  (R. at 281.)

The SSA denied Plaintiff's claims initially and again upon reconsideration.  (R. at 166-70, 177-81, 191-97.)  Plaintiff requested a hearing before an ALJ, and one was held on June 21, 2022.  (R. at 43-75, 198-99.)  At the hearing, the ALJ granted Plaintiff's motion to amend the alleged onset date to March 30, 2020 and to withdraw her application for Title II benefits.  (R. at 48-49.)  On July 13, 2022, the ALJ issued a written decision, finding Plaintiff not disabled under the Social Security Act ("the Act").  (R. at 16-34.)  On March 23, 2023, the SSA Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (R. at 1-4.)  Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

## II.   STANDARD OF REVIEW

The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual has a disability "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ."  *Id.* § 423(d)(2)(A).

---

[3] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers from this Memorandum Opinion.  The Court will further restrict its discussion of Plaintiff's medical information to the extent necessary to result in a proper analysis of the case.

SSA regulations set forth a five-step process to determine whether an individual is disabled. 20 C.F.R. § 416.920(a)(4); *see Mascio v. Colvin*, 780 F.3d 632, 634-35 (4th Cir. 2015) (describing the ALJ's five-step sequential evaluation).  At step one, the ALJ must review the claimant's current work activity to determine if he or she has been participating in substantial gainful activity.  20 C.F.R. § 416.920(a)(4)(i).  At step two, the ALJ must ask whether the claimant's medical impairments meet the regulations' severity and duration requirements.  *Id.* § 416.920(a)(4)(ii).  At step three, the ALJ must determine whether the medical impairments meet or equal an impairment listed in the regulations.  *Id.* § 416.920(a)(4)(iii).  Between steps three and four, the ALJ must determine the claimant's RFC, which accounts for the most that the claimant can do despite his or her impairments.  *Id.* § 416.925(a).

At step four, the ALJ must assess whether the claimant can perform his or her past employment given his or her RFC.  *Id.* § 416.920(a)(4)(iv).  The burden of proof remains with the claimant through step four of the analysis, and the claimant must prove that his or her limitations preclude the claimant from performing his or her past relevant work.  *See Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012).  If such past work can be performed, then benefits will not be awarded, and the analysis ends.  *See* 20 C.F.R. § 416.920(e).  However, if the claimant cannot perform his or her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant can perform other work that is available in the national economy.  *See id.* § 416.920(a)(4)(v).  The Commissioner usually offers this evidence through the testimony of a vocational expert.  *See Mascio*, 780 F.3d at 635.

In reviewing a decision to deny benefits, a court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are

supported by substantial evidence.'"  *Mascio*, 780 F.3d at 634 (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)).  Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion.  *See Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  The substantial evidence standard "presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts."  *Dunn v. Colvin*, 607 F. App'x 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).  Thus, a decision by the Commissioner is not subject to reversal merely because substantial evidence would have supported a different conclusion.  *Id.*

To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]."  *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)); *see Craig*, 76 F.3d. at 589.  The Court must consider the support for the Commissioner's decision and "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).  If a fact is supported by substantial evidence, the reviewing court must affirm, regardless of whether the court agrees with such findings.  *Hancock*, 667 F.3d at 476 (citing *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996)).  If the Commissioner's findings are arbitrary or unjustified, then they are not supported by substantial evidence, and the reviewing court must reverse the decision.  *See Breeden*, 493 F.2d at 1007.

### III.    THE ALJ'S DECISION

The ALJ analyzed Plaintiff's disability claim under the five-step evaluation process.  (R. at 16-34.)  *See* 20 C.F.R. § 416.920(a)(4); *Mascio*, 780 F.3d at 634.  At step one, the ALJ

determined that Plaintiff had not engaged in substantial gainful activity since March 30, 2020 (the amended alleged onset date). (R. at 20.) At step two, the ALJ found that Plaintiff suffered from the following severe impairments: migraines; borderline intellectual functioning; depressive, bipolar and related disorders; anxiety and obsessive-compulsive disorders; trauma- and stressor-related disorders; and ADHD. (R. at 20-21.) At step three, the ALJ concluded that Plaintiff did not have an impairment, individually or in combination, which met or equaled a disability listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21-23.)

The ALJ then determined Plaintiff's RFC. (R. at 23-31.) Based on the evidence in the record, the ALJ found that Plaintiff retained the ability to perform a full range of work at all exertional levels, with the following non-exertional limitations:

> [Plaintiff] can tolerate frequent exposure to vibration, concentrated atmospheric conditions (as defined in the Selected Characteristics of Occupations of the Dictionary of Occupational Titles (DOT)), and frequent exposure to hazards (such as unprotected heights and machinery with open, moving mechanical parts); and she can tolerate nothing louder than moderate noise level. [Plaintiff] is able to understand, remember and carry out simple instructions in a low stress environment, which is defined as a non-production setting (i.e. no assembly-line work), with few workplace changes, little independent decision making and no responsibility for the safety of others; and she can tolerate occasional interaction with the public.

(R. at 23-24.) In arriving at Plaintiff's RFC, and as required by 20 C.F.R. § 416.929 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016), the ALJ considered Plaintiff's symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. (R. at 24.)

The ALJ began by summarizing Plaintiff's subjective complaints and statements concerning the intensity, persistence, or functionally limiting effects of her symptoms. Plaintiff testified she could not work due to her ADHD, depression, bipolar disorder, and migraines. (R. at 24.) She stated she experienced a head injury in a 2011 motor vehicle accident which worsened

her conditions.  (R. at 24.)  Plaintiff reported difficulty with lifting, walking, sitting, standing, squatting, kneeling, talking, hearing, seeing, understanding, getting along with others, completing tasks, memorizing, and concentrating.  (R. at 24.)  She also testified that she could not engage in work activities due to her migraines, irritability, paranoia, crying spells, panic attacks, difficulty following one-step directions, and inability to focus and stay on task.  (R. at 24.)  The ALJ found Plaintiff's statements about "the intensity, persistence and limiting effects of these symptoms . . . not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  (R. at 26.)  The ALJ made this finding based on a review of the medical evidence for Plaintiff's impairments, analysis of Plaintiff's daily activities, and assessment of medical opinion evidence.  (R. at 25-31.)

The ALJ found that the medical records showed that Plaintiff's migraines and mental impairments were stable with medication and therapy during the relevant period.  (R. at 25-26.) On March 18, 2020, shortly before the amended onset date, Plaintiff sought treatment for a headache that had lasted two days and stemmed from her tripping over a car seat.  (R. at 25.) Plaintiff stated that her headache did not feel like a migraine and denied nausea, vomiting, dizziness, blurred vision, or balance issues.  (R. at 25.)  Plaintiff exhibited normal mood, behavior, speech, dress, motor activity, and thought process.  (R. at 25.)  She was diagnosed with a tension-type headache not intractable and prescribed medication.  (R. at 25.)  In May 2020, Plaintiff stated that her headaches had improved with an increased dose of medication and reported no side effects. (R. at 25.)  In March 2021, Plaintiff reported experiencing one to two headaches per month.  (R. at 25.)  In June 2021, a provider noted that Plaintiff was doing well and continued her on medication treatment for migraines.  (R. at 25-26.)  In December 2021, medical records noted Plaintiff's migraines as stable and controlled on her current medication regimen.  (R. at 26.)  In

April 2022, Plaintiff reported headaches in the left parietal region but described them as not very severe.  (R. at 26.)  She reported that medications worked well in controlling her migraines.  (R. at 26.)

Medical records similarly showed that Plaintiff's mental impairments were stable with medication and therapy during the relevant period.  (R. at 25-26.)  Providers noted that Plaintiff's mood, anxiety, and sleep had improved with treatment.  (R. at 25.)  Although Plaintiff experienced worsening symptoms following the death of a family member, she remained on the same medication regimen.  (R. at 26.)  In May 2022, Plaintiff described her depression as tolerable and reported normal appetite and energy levels.  (R. at 26.)  Plaintiff's provider noted that Plaintiff had "graduated from high school with a regular diploma."  (R. at 26.)  The provider also found that Plaintiff exhibited good grooming, cooperative attitude, anxious mood, congruent affect, logical and goal directed thought process, no delusion or paranoid thoughts, no hallucinations, and good insight and judgment.  (R. at 26.)  Plaintiff was continued on her medication and encouraged to attend individual therapy sessions and increase her social activities.  (R. at 26.)

The ALJ concluded that the medical evidence showed that Plaintiff had "been treated primarily with medications, and counseling services, which appear to have been relatively effective in controlling her symptoms when she was compliant with treatment."  (R. at 27.)  Moreover, the ALJ found that the treatment notes, examination findings, and objective diagnostic testing results did not support Plaintiff's allegations of debilitating physical and mental symptoms and provided "no evidence that her impairments cannot be controlled or remedied with medication and appropriate treatment."  (R. at 27.)

The ALJ also determined that Plaintiff's activities of daily living further support that her "limitations do not preclude all employment" and that she is "capable of working within the

established" RFC.  (R. at 27.)  Plaintiff reported watching television, reading for pleasure, and listening to music.  (R. at 27.)  She could schedule and attend medical appointments, take medications as prescribed with reminders, manage her own finances, and shop for groceries.  (R. at 27.)  Plaintiff could prepare simple meals and perform household chores, such as washing dishes, doing laundry, and cleaning her room.  (R. at 27.)  Plaintiff was able to care for her personal hygiene with reminders.  (R. at 27.)  Plaintiff stated she could not maintain good relations with family or friends and reported trouble getting along with authority figures, but Plaintiff could function in grocery stores, church, and medical offices.  (R. at 27-28.)  The ALJ concluded that Plaintiff's "ability to attend scheduled appointments, carry out daily tasks, and adequately take care of her personal hygiene and other personal needs, in conjunction with the medical evidence demonstrating minimal abnormalities, does not reflect an individual unable to sustain regular work due to medically determinable impairment(s)."  (R. at 27.)

The ALJ also considered medical opinions as required by 20 C.F.R. § 416.920c.  (R. at 24.) First, the ALJ found the medical opinions of state agency medical consultant Nicolas Tulou, M.D., and state agency expert Robert McGuffin, M.D., persuasive.  (R. at 28.)  Dr. Tulou opined that Plaintiff had no exertional, postural, manipulative, visual, or communicative limitations, and rather had only non-exertional limitations that required her to avoid concentrated exposure to extreme heat, humidity, noise, fumes, odors, dust, gases, and areas with poor ventilation.  (R. at 28.)  Dr. McGuffin's findings were similar, except that he found Plaintiff should also avoid hazards, such as unprotected heights and moving mechanical machinery.  (R. at 28.)  The ALJ found these opinions generally consistent with the record and supported by the doctors' explanations based on their review of the evidence.  (R. at 28.)  Even though more evidence has been received since Dr. Tulou and Dr. McGuffin completed their reports, the ALJ found that their opinions remained

largely consistent with the evidence because Plaintiff's "exposure to heat and noise could exacerbate her [migraines], while her pain might make it dangerous for her to work around vibration and hazards." (R. at 28.) Further, the ALJ concluded that Plaintiff's treatment notes showed no substantial limitations from physical symptoms. (R. at 28.)

Next, the ALJ considered the opinions of state agency reviewing psychologists Howard Leizer, Ph.D., and Eric Oritt, Ph.D. Dr. Leizer opined that Plaintiff could recall short and simple instructions but would have difficulty remembering and understanding complex or detailed information. (R. at 28.) He also concluded Plaintiff could perform familiar or routine procedures and maintain concentration and attention for two-hour periods. (R. at 28-29.) Although she would need assistance adapting to frequent or sudden change, Dr. Leizer stated that Plaintiff would be able to maintain an ordinary routine (with minimal changes to usual job duties). He also determined that Plaintiff could complete a normal workweek at a pace consistent with others, with only minimal need for accommodations on an infrequent basis. (R. at 29.) Dr. Oritt similarly found that Plaintiff could perform simple, routine tasks. (R. at 29.)

The ALJ assigned these opinions persuasive weight, finding them consistent with the medical evidence and supported by objective medical testing. (R. at 28-29.) The ALJ explained that while "[t]reatment notes indicate that [Plaintiff] does have severe mental health impairments or restrictions" and "does experience some limitations from her mental health symptoms," she "remains able to perform activities of daily living, and perform basic tasks independently without substantial support." (R. at 29.) Giving Plaintiff "the maximum benefit," the ALJ included "additional social and mental limitations" in the RFC. (R. at 29.)

The ALJ next considered the opinions of NP Liverman, Dr. Alam, NP Kelley-Pope, and LCSW Mehl. (R. at 29-31.) In a July 2020 assessment, NP Liverman noted that she had treated

Plaintiff since April 2019 for ADHD, post-traumatic stress disorder ("PTSD"), and mood disorder. (R. at 29.)  Although she described Plaintiff's mental health as stable, NP Liverman found Plaintiff moderately, markedly, or extremely impaired in 10 of 11 subcategories of concentration and persistence, moderately impaired in her ability to maintain a schedule and regular attendance, extremely impaired in all subcategories of social interaction, and extremely impaired in all subcategories of adaptation.  (R. at 29.)

In August 2021, Dr. Alam opined that Plaintiff was capable of low stress work when her headaches were controlled.  (R. at 30.)  He noted that Plaintiff had three headaches a week lasting at least six hours and that Plaintiff may need to take unscheduled breaks two to three times a week with a day of rest before returning to work following a headache.  (R. at 30.)  Dr. Alam concluded that Plaintiff would be off task 15 percent of the time and would be absent from work more than four days per month.  (R. at 30.)  Dr. Alam had been treating Plaintiff since March 2021 or for about five months at the time.  (R. at 30.)

In a November 2021 assessment, NP Kelley-Pope stated that she had treated Plaintiff for just over a month—since October 2021—for ADHD, PTSD, and mood disorder.  (R. at 30.)  NP Kelley-Pope noted that Plaintiff relied on family assistance for her activities of daily living.  (R. at 30.)  She also opined that Plaintiff could not work due to extreme anxiety and impaired cognition. (R. at 30.)  NP Kelley-Pope found Plaintiff moderately, markedly, or extremely impaired in all subcategories of sustained concentration and persistence, moderately impaired in the ability to carry out very short and simple instructions, markedly or extremely impaired in all subcategories of social interaction, markedly impaired in her ability to ask simple questions and seek assistance, moderately to extremely impaired in all subcategories of adaptation, and moderately impaired in her ability to recognize normal hazards and take precautions.  (R. at 30.)

In a June 2022 statement, LCSW Mehl noted that Plaintiff regularly presented as disheveled, overly malodorous, and exhibiting poor hygiene.  (R. at 30.)  LCSW Mehl listed Plaintiff's ability to complete base-line activities of daily living as poor.  (R. at 30.)  She further opined that Plaintiff's paranoia and mood and behavioral incongruencies were significant obstacles to Plaintiff's interpersonal and social functioning.  (R. at 30.)  Although LCSW Mehl acknowledged that Plaintiff's mental condition had made some improvements over the years, she found Plaintiff to be a safety risk and ill-equipped to function in the workplace.  (R. at 30.)

The ALJ found the opinions of NP Liverman, Dr. Alam, NP Kelley-Pope, and LCSW Mehl unpersuasive.  (R. at 29, 30, 31.)  She determined that their opinions were not supported and were not entirely consistent with the medical evidence.  (R. at 31.)  The ALJ concluded that the medical evidence revealed limited abnormalities, that Plaintiff's conditions appeared stable with medication, that Plaintiff's headaches were infrequent with medication, and that Plaintiff could handle her own care and independently complete activities of daily living.  (R. at 31.)  Contrary to the treatment providers' opinions, this evidence suggested to the ALJ that Plaintiff did not experience significant limitations from her physical or mental impairments.  (R. at 31.)

After completing the RFC assessment, the ALJ found at step four that Plaintiff could not perform her past relevant work as a childcare worker.  (R. at 31-32.)  The ALJ then determined Plaintiff's vocational factors, finding that she met the definition of a younger individual and had at least a high school education.  (R. at 32.)  At step five, the ALJ concluded that there were jobs in significant numbers in the national economy that Plaintiff could perform given her limitations and other vocational factors.  (R. at 32-33.)  The ALJ adopted the vocational expert's testimony that Plaintiff could perform the jobs of sorter, stock clerk, hand bander, and produce weigher.  (R.

at 32-33.)  The ALJ determined that Plaintiff had not been under a disability since March 30, 2020. (R. at 33.)

## IV.    ANALYSIS

### A.  Substantial Evidence Supports the RFC Determination

The ALJ's decision provides a sufficient narrative discussion of her assessment of the overall evidence and how it supports the RFC finding.  As noted by the ALJ, examinations largely included normal findings.  Treatment notes indicated that Plaintiff's symptoms improved with medication and treatment and were controlled or stable during the period at issue.  In addition, Plaintiff maintained activities of daily living.  Persuasive medical opinion evidence also supported the RFC.  The ALJ found that the evidence, as a whole, did not support the degree of limitation alleged by Plaintiff and instead showed that Plaintiff's limitations did not preclude her from working within the established RFC.  (R. at 27.)  Although the ALJ found that medication and treatment effectively controlled Plaintiff's symptoms, in considering her impairments, including her migraines, borderline intellectual functioning, and mental conditions, the ALJ limited Plaintiff to moderate noise levels, simple instructions, a low stress environment, a non-production setting, few workplace changes, little independent decision making, no responsibility for others, and occasional interaction with the public.  (R. at 23-24, 27.)  This RFC determination finds substantial support in the evidence.

In challenging the RFC, Plaintiff contends that the ALJ failed to make a specific finding on whether Plaintiff's intermittent incapacity renders her unable to engage in substantial gainful employment.  (Pl.'s Mem. at 13.)  Specifically, Plaintiff argues that the ALJ limited her to unskilled work but failed to consider how Plaintiff's migraines and mental impairments would prevent her from performing such work with "any regularity or consistency."  (Pl.'s Mem. at 14.)  Plaintiff further contends that the ALJ improperly relied on her reported activities of daily living even

though they do not reflect her ability to perform sustained work on a regular and continuing basis. (Pl.'s Mem. at 15.)  She relies on *Rose v. Saul* to support her assertion.  (Pl.'s Mem. 13-15 (citing *Rose v. Saul*, No. 7:19-cv-91, 2020 WL 4740479, at *4 (E.D.N.C. Aug. 14, 2020)).)  This argument fails.

In the *Rose* decision, the record therein established the plaintiff as intermittently incapacitated, yet the ALJ's decision contained "no finding or discussion about his ability to perform . . . work with any regularity or consistency."  *Id.* at *4.  Here, on the other hand, the ALJ made specific findings that treatment notes, examination findings, and objective diagnostic testing results did not support the degree of limitations alleged by Plaintiff.  (R. at 27.)  Instead, such evidence showed that Plaintiff's impairments and resulting symptoms were managed and controlled through medication and/or therapy.  (R. at 27.)  In doing so, the ALJ reasonably considered Plaintiff's ability to concentrate, persist, and maintain pace, as well as her reported activities without overstating those activities.

The ALJ determined that Plaintiff could "understand, remember and carry out simple instructions in a low stress [working] environment" in a non-production setting.  (R. at 22, 23.)  Plaintiff acknowledged she could read books, watch television, count change, manage a checking account, care for her personal hygiene with reminders, cook simple meals, sometimes do laundry and clean her room, shop for groceries, attend medical appointments independently, and visit with family and friends.  (R. at 52-54, 59-61, 65, 67.)  The ALJ found "no evidence that her impairments cannot be controlled or remedied with medication and appropriate treatment."  (R. at 27.)  In other words, the ALJ rejected any argument that Plaintiff would suffer from intermittent incapacity such that her time off task or absenteeism would preclude her from work.  Instead, the ALJ found the

medical evidence and Plaintiff's reported activities demonstrated that she could sustain regular work.  (R. at 27.)

Plaintiff next contends that the ALJ did not properly consider Plaintiff's intellectual disability and resulting need for special supervision.  (Pl.'s Mem. at 18.)  For support, she cites to opinions from consultative examiners from 2011 and 2015 indicating that Plaintiff "would likely need more than the usual amount of supervision when learning new tasks," would benefit from "[h]ands on supervision with instructions," and "may require a minimal degree of extra assistance and supervision in completing these simple and repetitive work tasks."  (R. at 736, 742.)  Plaintiff contends that the vocational expert testified that no work would be available for an individual with Plaintiff's RFC who also requires frequent special supervision.  (Pl.'s Mem. at 18.)  The ALJ did consider these opinions but found them to be conclusory and less persuasive because they focused on a time frame well before the disability period at issue.  (R. at 29.)  In addition, for the 2015 examination, the examiner suspected that Plaintiff "may have intentionally exaggerated some of her cognitive limitations, including memory functioning."  (R. at 741.)  Moreover, while Plaintiff focuses on low IQ scores and portions of the record referencing Plaintiff graduating with a special diploma in 2006 (Pl.'s Mem. 3-4), other record evidence indicates Plaintiff received a regular diploma, including examiner opinions and provider notes (R. at 26, 576, 728, 738, 1010).  In any event, after considering Plaintiff's borderline intellectual functioning impairment, the ALJ reasonably restricted Plaintiff to understanding, remembering, and carrying out simple instructions in a low stress, non-production environment with few workplace changes, little independent decision making, and no responsibility for the safety of others.  (R. at 23-24.)

Plaintiff also contends that the RFC overestimates her ability to interact with others by not limiting her interaction with coworkers.  (Pl.'s Mem. at 18.)  The Court finds no error.  The ALJ

reasonably found Plaintiff had moderate limitations in interacting with others.   (R. at 22.)
Although acknowledging Plaintiff's testimony that she struggled in her relationships with family
and friends and had difficulties with authority figures, Plaintiff acknowledged visiting with others,
shopping monthly in stores, and attending church.  (R. at 22.)  Therefore, the ALJ found that she
could function appropriately in the public.  (R. at 22.)  Treatment notes also showed that Plaintiff
demonstrated no abnormal social behaviors during appointments and her doctors rarely mentioned
issues in social interaction.  (R. at 22.)  Rather, she had a "good rapport" with providers and was
"consistently described as cooperative."  (R. at 22.)  Thus, the ALJ did not err in only limiting
Plaintiff to occasional interaction with the public.  (R. at 24.)

Ultimately, while Plaintiff may disagree with how the ALJ viewed conflicting evidence
regarding her ability to perform regular and sustained work, the limiting effects of her intellectual
disability, and Plaintiff's ability to interact with others (Pl.'s Mem. at 14-15, 18-19), it is not within
the Court's purview to reweigh evidence that the ALJ considered.  *See Mastro v. Apfel*, 270 F.3d
171, 176 (4th Cir. 2001).  Because the ALJ applied the correct legal standards in arriving at the
RFC determination and substantial evidence supports that determination, the Court will not disturb
the ALJ's decision.

### B.  The ALJ Applied Correct Legal Standards in Evaluating Medical Opinions, and Substantial Evidence Supports the ALJ's Findings

Plaintiff next argues that the ALJ failed to apply correct legal standards in considering the
opinions of Dr. Alam, NP Liverman, NP Kelley-Pope, and LCSW Mehl.  Specifically, she
contends that the ALJ erred in rejecting those opinions in "one paragraph using generalized
statements" and by failing to address each factor outlined by applicable regulations.  (Pl.'s Mem.
at 16-17.)  Review of the decision and record shows that the ALJ analyzed the medical opinion

evidence consistent with applicable legal standards and that substantial evidence supports the ALJ's findings regarding the weight assigned to those opinions.

*1.   Applicable Regulations for Evaluating Medical Opinion Evidence*

Under applicable regulations,[4] the ALJ must consider and evaluate the persuasiveness of all medical opinions or prior administrative medical findings from medical sources without deferring or giving any specific evidentiary weight to any medical source.   20 C.F.R. § 416.920c(a).   Specifically, the ALJ must articulate the "persuasiveness" of all medical opinions by considering five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors that tend to support or contradict the medical opinion[,]" including familiarity with the other evidence or understanding of disability program policies and requirements.   *Id.* § 416.920c(b)-(c).

Supportability and consistency are the "most important" factors, and the ALJ must discuss how these factors were considered in the written decision.   *Id.* § 416.920c(b)(2).   The regulations define supportability and consistency as follows:

> (1) *Supportability*. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

> (2) *Consistency*. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

*Id.* § 416.920c(c)(1)-(2).   The ALJ may, but is not required to, explain how the other factors were considered.   *Id.* § 416.920c(b)(2).

---

[4]  Claims involving medical opinion evidence filed on or after March 27, 2017 are evaluated using a revised regulatory framework.   20 C.F.R. § 416.920c.   (*See also* Pl.'s Mem. at 16; Def.'s Mem. 23-24.)

### 2. Dr. Alam's Medical Opinion

On August 20, 2021, Dr. Alam completed a Headache Medical Source Statement.  (R. at 30, 1051-55.)  At that time, Dr. Alam had been treating Plaintiff since March 11, 2021, or for about five months.  (R. at 30, 1055.)  Dr. Alam noted that Plaintiff had approximately three headaches per week, lasting approximately six hours each.  (R. at 1051.)  He characterized her headaches as "migraines" and found that they were accompanied by vertigo, nausea/vomiting, photophobia, throbbing pain, inability to concentrate, exhaustion, phonophobia, and visual disturbances, and became worse with activity.  (R. at 1051.)  Dr. Alam stated that Plaintiff's headaches were triggered by bright lights, hunger, lack of sleep, noise, stress, strong odors, and changes in weather.  (R. at 30, 1052.) Dr. Alam believed that her migraines should improve with titration of medication.  (R. at 30, 1053.)

Dr. Alam found that Plaintiff had no physical restrictions from her migraines.  (R. at 1054.)  He opined that Plaintiff could work if her headaches were controlled but limited her to low stress work environments.  (R. at 30, 1052.)  He further stated that Plaintiff would need unscheduled breaks two to three times per week and would likely need an entire day to rest following a migraine before returning to work.  (R. at 30, 1053.)  Therefore, he stated that Plaintiff would be "off task" 15 percent of the workday and absent more than four days per month.  (R. at 30, 1053.)

### 3. NP Liverman's Medical Opinion

On July 22, 2020, NP Liverman completed a Mental Capacity Assessment form for Plaintiff.  (R. at 822-24.)  At the time, NP Liverman had been seeing Plaintiff since April 2, 2019 or for about fifteen months.  (R. at 29, 824.)  She listed Plaintiff's diagnoses as ADHD, PTSD, and mood disorder.  (R. at 29, 822.) NP Liverman stated that Plaintiff's conditions were "stable from

[a] mental health capacity," but noted that Plaintiff "requires guidance for ADL [activities of daily living] care, medication administration, and daily monitoring." (R. at 824.)

NP Liverman found that Plaintiff was extremely limited in: the ability to work in coordination with or in proximity to others without being distracted; the ability to make simple work-related decisions; the ability to complete a normal work day or week without interruptions from symptoms; the ability to perform at a consistent pace with normal breaks; all social interaction abilities (including the ability to interact appropriately with the general public, ask simple questions or ask for help, accept instructions and respond appropriately to supervisor criticism, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, or maintain socially appropriate behavior and adhere to basic standards of cleanliness and neatness); and all adaptation abilities (including the ability to respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use means of public transportation, and set realistic goals or make plans independently). (R. at 822-23.) An extreme limitation under the assessment indicated an inability to function in the area altogether. (R. at 822.)

NP Liverman found that Plaintiff was markedly limited in the ability to carry out very short and simple instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and sustain an ordinary routine without special supervision. (R. at 822.) A marked limitation indicated an inability to function in an area two-thirds of an eight-hour workday. (R. at 822.)

Lastly, NP Liverman found that Plaintiff had a moderate limitation in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary

tolerances.  (R. at 822.)  For purposes of the assessment, a moderate limitation indicated an inability to function in an area one-third of an eight-hour workday.  (R. at 822.)

### 4.  NP Kelley-Pope's Medical Opinion

On November 19, 2021, NP Kelley-Pope completed a Mental Capacity Assessment after treating Plaintiff for just over a month.  (R. at 30, 905-07.)  She opined that Plaintiff was extremely limited in nearly all subcategories of sustained concentration and persistence, social interaction, and adaptation, including the ability to: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; complete a normal work day or week without interruptions from symptoms; perform at a consistent pace with normal breaks; interact appropriately with the general public; accept instructions and respond appropriately to supervisor criticism; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of cleanliness and neatness; respond appropriately to changes in the work setting; travel in unfamiliar places or use means of public transportation; and set realistic goals or make plans independently.  (R. at 905-06.)

NP Kelley-Pope further found Plaintiff markedly limited in her ability to make simple work-related decisions, ask simple questions, or ask for help.  (R. at 905-06.)  Finally, she opined that Plaintiff was moderately limited in her ability to carry out very short and simple instructions and in her ability to be aware of normal hazards and take appropriate precautions.  (R. at 905-06.)  NP Kelley-Pope also stated that Plaintiff depends on her family for assistance with her activities

of daily living and found her unable to work due to extreme anxiety and impaired cognition.  (R. at 907.)

### 5.  *LCSW Mehl's Medical Opinion*

LCSW Mehl wrote a letter to the SSA dated June 17, 2022.  (R. at 1050.)  Therein, LCSW Mehl listed Plaintiff's diagnoses as schizoaffective disorder, bipolar type; intellectual disability/borderline intellectual functioning; and traumatic brain injury via a past motor vehicle accident.  (R. at 30, 1050.)  LCSW Mehl stated that Plaintiff's functioning levels "widely fluctuate" depending upon "the acuity of symptoms presented by the severity of her mental illness."  (R. at 1050.)  Further, Plaintiff's "base-line ADL [activities of daily living] functioning is quite poor as she consistently presents as disheveled, significantly poor dentation, lack of personal hygiene, overtly malodorous.  Her illness causes periodic spikes in paranoia that escalate to psychotic proportions."  (R. at 30, 1050.)  LCSW Mehl opined that Plaintiff's "mood and behavioral incongruencies are significant obstacles to rational/effective interpersonal and social functioning" as her moods, mannerisms, and tone of voice "vary between childlike to gruff/stern and are often incongruent to topic/context."  (R. at 30, 1050.)  She found that Plaintiff's mental illness was "chronic and long-term" and although she had made improvements over the years, her "base-line status is ill equipped and poses a safety risk within the workplace."  (R. at 30, 1050.)

### 6.  *The ALJ's Analysis Comports with Applicable Law and Is Supported by Substantial Evidence*

After summarizing each of the opinions above, the ALJ found them unpersuasive.  (R. at 29-31.)  Specifically, the ALJ concluded that the "evaluations and assessments of these providers are not entirely consistent with the medical evidence of record including treatment notes, physical and mental examinations showing limited abnormalities" and "not entirely supported in the record."  (R. at 31.)  While acknowledging Plaintiff's mental health conditions and that

21

examinations have revealed some abnormalities affecting her mental capacity, the ALJ concluded

that "the record does not support the level of limitation" found by these providers.  (R. at 31.)  The

ALJ explained:

> [Plaintiff's] headaches were well managed with treatment, and they were infrequent with medication.  Her depression appeared stable with medication.  She could handle her basic care, maintain her own safety, and prepare simple meals.  There was no evidence that she needed daily monitoring, or that she depended on her family for assistance with basic life skills.  She was admittedly able to perform household chores. . . .  Treatment notes indicate that [Plaintiff] does not experience significant limitations from her physical or mental health symptoms.  This suggests that the limitations opined by the treatment providers above are not supported by the medical evidence. . . .  The evidence of record, including treatment notes and limited abnormal physical and mental examination findings, does not contain objective physical or mental examination abnormalities that would support the significant limitations, and does not support the opinions.

(R. at 31.)  The ALJ concluded that the RFC properly accounts for Plaintiff's limitations and noted

that she gave Plaintiff maximum benefit by including additional restrictions in the RFC.  (R. at

31.)  This analysis comports with applicable regulations, and substantial evidence supports the

ALJ's decision to afford the medical opinions less persuasive weight.

Plaintiff criticizes the ALJ for weighing the opinions "within one paragraph using

generalized statements" (Pl.'s Mem. at 16) and for failing to cite to specific "treatment notes or

medical evidence to support any of her findings" (Pl.'s Mem. at 17).  The paragraph at issue,

however, contains multiple reasons for assigning these opinions less persuasive weight and

references earlier more detailed discussions regarding Plaintiff's testimony, medical records, and

activities of daily living.  The earlier analysis includes record citations.  Thus, the ALJ's decision,

when viewed as a whole, provides a sufficient narrative explanation of the ALJ's conclusions and

a logical bridge connecting the substantial supporting evidence to her conclusions.  *See Monroe v.

Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (noting that the ALJ must "build an accurate and logical

bridge from the evidence to his conclusion"); *Todd A. v. Kijakazi*, No. 3:20-cv-594, 2021 WL 5348668, at *8 (E.D. Va. Nov. 16, 2021) (finding that the ALJ's opinion must be read as a whole).

Plaintiff next contends that the ALJ failed to adequately address each of the 20 C.F.R. § 416.920c factors.  (Pl.'s Mem. at 17.)  Under applicable regulations, however, the ALJ is *not* required to explain how factors other than supportability and consistency were considered.  20 C.F.R. § 416.920c(b)(2).  In any event, the ALJ's decision does touch on other factors outlined by this regulation, including the relationship between these providers and Plaintiff, their specialization, and the length of the treating relationship.  (R. at 25-26, 29-31.)  It also provides a more detailed analysis of the supportability and consistency factors.  (R. at 31.)

The ALJ reasonably found the medical opinions as lacking support.  Indeed, none of the providers chose to "[a]ttach all relevant treatment notes, laboratory and test results as appropriate" (R. at 1051) or otherwise "describe the medical/clinical findings that support this assessment" (R. at 828, 906).  Moreover, as noted by the ALJ and as further discussed below under the consistency factor, those treatment records, which appear elsewhere in the record, do *not* support the level of limitations found by these providers.  (*See* R. at 24-27.)

The ALJ also reasonably found that these opinions were not entirely consistent with the record, including treatment notes, physical and mental examinations showing limited abnormalities, and Plaintiff's activities of daily living.  (R. at 31.)  Regarding migraines, treatment records show that Plaintiff went from experiencing daily headaches prior to the amended onset date to far less frequent and less severe migraines during the period at issue.  With medication compliance, Plaintiff achieved a reduction to two to three headaches a week, then a few a month, and then reported doing well with her migraines under control.  (R. at 25-26, 31, 798-99, 801, 847-

48, 885, 895, 910-12, 917, 921, 933.)   Substantial evidence supports the ALJ's finding that Plaintiff's migraines were stable and under control during the relevant period.

Regarding Plaintiff's mental impairments, the record similarly provides substantial support for the ALJ's conclusion that those impairments were stable with medication and therapy and not as limiting as opined by NP Liverman, NP Kelley-Pope, and LCSW Mehl.   Treatment records with NP Liverman ranked Plaintiff's depression as mild or minimal and indicated that Plaintiff's mood, depression, and anxiety had improved.   (R. at 26, 31, 835-36.)   NP Kelley-Pope noted in treatment records that Plaintiff had good to fair grooming; cooperative attitude; logical and goal-directed thoughts; fair or good insight and judgment; and "good," "alright," or "anxious" moods.   (R. at 26, 1012, 1021, 1025-26, 1029.)   NP Kelley-Pope's records also stated that Plaintiff graduated high school with a regular diploma.   (R. at 26, 1010, 1014, 1018, 1024, 1027, 1032, 1036, 1040, 1045.) Treatment records with LCSW Mehl noted that Plaintiff presented with normal appearance, normal speech, normal attention/vigilance/concentration, normal reasoning, intact judgment and insight, normal thought content and processes, and with intact short- and long-term memory.   (R. at 26, 1000-01, 1003-04, 1006-07.)   Additionally, Plaintiff stated she could care for her personal needs and grooming with reminders, cook simple meals, clean her room, do her laundry, shop for groceries, visit friends and family, read books, count change, and manage personal finances.   (R. at 27-28, 53-54, 60-61, 291.)[5]   The ALJ did not err in finding this record evidence inconsistent with the level of limitations found by NP Liverman, NP Kelley-Pope, and LCSW Mehl.

---

[5] While Plaintiff contends that other record evidence contradicts the ALJ's findings (Pl.'s Mem. at 16), the Court declines to reweigh the evidence considered by the ALJ or otherwise substitute its judgment for that of the ALJ.  *Hancock*, 667 F.3d at 472.

## V.     CONCLUSION

For the reasons set forth above, the Court will DENY Plaintiff's Motion for Summary Judgment (ECF No. 11), GRANT the Commissioner's Motion for Summary Judgment (ECF No. 13), and AFFIRM the final decision of the Commissioner.  An appropriate Order will accompany this Memorandum Opinion.

_____ /s/

Summer L. Speight
United States Magistrate Judge

Richmond, Virginia
Date: September 30, 2024